98 P.3d 116 (2004)
123 Wash.App. 443
Kurtis and Pamela MAYER, Respondents,
v.
STO INDUSTRIES, INC., Appellant.
No. 29549-1-II.
Court of Appeals of Washington, Division 2.
September 21, 2004.
*117 James Benjamin Meade, Forsberg & Umlauf, Seattle, WA, Warren J. Daheim, Attorney at Law, Tacoma, WA, for Respondent.
Kenneth F. Hobbs, Stafford Frey Cooper, Seattle, WA, Philip Albert Talmadge, Talmadge Law Group PLLC, Tukwila, WA, for Appellant.
BRIDGEWATER, J.
Sto Industries, Inc. appeals the imposition of discovery sanctions and attorney fees after a second trial that we ordered because of newly discovered evidence that Sto failed to disclose before the first trial. Kurtis and Pamela Mayer cross-appeal, asserting that the trial court should have imposed a greater discovery sanction and that they were entitled to recover all their costs for the second trial. We hold when the trial court imposes discovery sanctions, whether under CR 26(g) or CR 37(b), it must comply with the requirements of Burnet v. Spokane Ambulance, 131 Wash.2d 484, 933 P.2d 1036 (1997), and delineate the specific authority it is employing and its consideration of lesser sanctions. Here, the trial court's order does not address the issue, although it imposed $468,147.29 for attorney fees and costs from the first trial. Our holding also requires the trial court to *118 strike all interest that it imposed on the sanctions and attorney fees for the first trial, the sum of $276,732.75, because there is no basis for such an award and it was not a liquidated sum.
Although we hold that substantial evidence supports the Washington Consumer Protection Act (CPA) claim, it was not time barred, and the court could impose attorney fees using a lodestar multiplier, we remand because the trial court did not segregate the CPA claims from other claims. Segregation of attorney fees from other claims, which the court granted in the sum of $352,693.50 in the second trial, is necessary; and under Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 599, 675 P.2d 193 (1983), the lodestar multiplier may only be applied to fees after the contingent fee agreement is effective, not to the entire attorney fee award. On remand, the trial court must segregate the claims and award fees only for the CPA claim.
We also hold that the trial court properly instructed the jury on valuating damages, i.e., both stigma damages, that is diminution in value, and cost of repair. Finally, we hold that Nordstrom, Inc. v. Tampourlos, 107 Wash.2d 735, 733 P.2d 208 (1987), requires that the court may only award costs under RCW 19.86.090, the CPA, for those expenses listed under RCW 4.84.010, not the $48,691.05 that it granted in this case. As to the cross-appeal, we decline the Mayers' invitation to impose greater sanctions and pay them to the Law Fund because we can discern no meritorious basis for doing so. We award no attorney fees on appeal.
We reverse and remand.

FACTS
Sto Industries (Sto) is a manufacturer of a siding product used on residential and commercial construction known as Exterior Insulation and Finish System (EIFS). EIFS is a product designed to prevent water from penetrating beyond the face of the cladding. Sto has sold and installed its EIFS system on thousands of commercial and residential buildings across the United States since 1979.
Sto markets its products through independent distributors. Under the distributorship agreements, Sto does not authorize the sale of its products to "consumers" but rather to construction professionals. 4 Report of Proceedings (RP) (Apr. 4, 2002) at 485. These professionals are recruited by a distributor and have completed a Sto training program.
In 1988, Kurtis Mayer hired architect Donald Bazemore to design an extensive remodel of a waterfront vacation residence he and his wife, Pamela, owned on Puget Sound in Dash Point. The Mayers had owned the property since 1962.
The Mayers wanted their remodeled vacation home to resemble a Mediterranean villa and they told Bazemore they would like to have stucco siding. At some time after that decision, the Mayers and Bazemore decided to utilize EIFS instead of stucco. Initially, Bazemore chose to use the EIFS system Dryvit manufactured.
Before making the decision to change from stucco to Dryvit, Bazemore obtained and reviewed literature from Dryvit to become familiar with the characteristics of the product. He then discussed the products with Kurtis Mayer who made the final decision to use the Dryvit EIFS system. Mayer received an estimate from subcontractor, Andy's Plastering, to provide and install the Dryvit EIFS system.
After the Mayers decided to use the Dryvit EIFS system, James Parish, a long-time acquaintance of Bazemore, approached Bazemore about using Sto products. Parish was an independent manufacturer's representative for Northwest Tile and Coatings. As part of its product line, Northwest Tile sold Sto products. Parish presented the Sto product line to Bazemore. During his presentation, Bazemore asked Parish to discuss the Sto EIFS system. Bazemore then recommended the Sto products to Kurtis and he accepted the recommendation.
Kurtis Mayer fired Bazemore shortly after deciding to use the Sto products because of a dispute over Bazemore's bills. Kurtis did not hire another architect to replace Bazemore. Instead, Kurtis became the general contractor on the vacation home project. *119 Kurtis was a licensed general contractor with over 25 years' experience in the industry. He had built more than 3,000 single-family residences during his career.
Parish met with Kurtis and presented Sto product literature and brought a product sample with him for Kurtis to review. Kurtis also relied on brochures and written materials. He chose to use the Sto product because of the substantial cost savings to him and a longer warranty period. Kurtis negotiated with Parish to obtain the Sto products at Northwest Tile's wholesale price. He also asked Parish to recommend a contractor to apply the Sto products. Parish provided the name of three different applicators. Kurtis chose Pacific Alki Plaster Company to apply the product, one of the applicators Parish recommended.
Pacific Alki applied the Sto products to the Mayers' house in April 1989. None of Sto's employees witnessed any of Pacific Alki's work. Sto issued a seven-year limited warranty of its products to the Mayers. Although Sto provided a warranty for its product, it never warranted Pacific Alki's work.
The Mayers chose to purchase window products from Marvin Windows, Inc. through McSweeney Steel Company in March 1989. The Mayers' subcontractor installed the windows that same month.
In 1990, the Mayers noticed rust spots appearing below the windows and penetrating into the Sto finish. Marvin Windows diagnosed the problem as water penetrating through unsealed joints in the windows, causing non-galvanized nails used in the manufacturing of the windows to rust. Marvin Windows repaired the damage by caulking around the windows and repainting the windows and the Sto finish. Marvin Windows's insurance company, Home Insurance, paid for the cost of exterior finish painting on behalf of Marvin Windows. Unfortunately, the caulking work entombed the water that had previously penetrated the windows. In 1994, the Mayers discovered dry rot in the wood trim of the windows and the substructure of the exterior walls.
The Mayers sued Sto, Marvin Windows, Northwest Tile and Coatings, and McSweeney Steel in April 1995. In early 1996, the Mayers learned of other EIFS litigation occurring on the east coast, and they amended their complaint to add a claim under the CPA. By early 1997, the Mayers had settled with all of the defendants except Sto.
The Mayers amended their complaint a second time in 1996. By the time of the second amended complaint, the only claims against Sto were based on the Washington Product Liability Act (WPLA), chapter 7.72 RCW, and the CPA, chapter 19.86 RCW. The Mayers did not specifically mention the WPLA claim in their second amended complaint.
During the first trial, the Mayers made several discovery requests and also asked that Sto update its responses. Sto failed to provide a memorandum discussing the inherent flaws in the EIFS system. The case was tried in June 1997, before the Honorable John McCarthy.
Kurtis testified at trial that the decision to use the Dryvit barrier system occurred before he knew about the Sto products. He stated that the aesthetic look of the house drove his decision as to which siding he wanted on his house. Kurtis further stated that he relied on Sto's written materials in making the decision to use Sto over Dryvit. He also testified that the cost savings of using Sto over Dryvit and the longer warranty period from Sto were two considerations in choosing to use the Sto product. Kurtis further stated that he spent $385,564.82 repairing the damage from the EIFS system. The Mayers' expert, John Kilpatrick, testified that the diminution in the home's value was 20 percent of the home's value or $187,000.
At the end of the trial, the jury returned a verdict in Sto's favor. After the verdict, the Mayers received a memorandum from an attorney involved in litigation in North Carolina over the Sto's EIFS system. The memorandum was written by Thomas Remmele, the technical services manager for Sto. In his memorandum, Remmele admitted that *120 the EIFS system had an inherent flaw.[1] The Mayers moved for a new trial on July 31, 1997, based on the Remmele memorandum. The trial court denied the Mayers' motion. The court also denied the Mayers' motion for reconsideration.
The Mayers appealed and, in an unpublished opinion, we reversed the trial court's ruling and granted the Mayers a new trial based on newly discovered evidence.[2] The Mayers moved for a discovery sanction against Sto under CR 26(g) after the remand. The trial court determined that Sto's counsel complied with CR 26(g) but that Sto should have produced the Remmele memorandum. After making its ruling, the court deferred considering the motion pending the outcome of the second trial. The parties accepted Judge McCarthy's offer to recuse himself from the case, and the case was reassigned to the Honorable Rosanne Buckner.
In the second trial, the jury returned a verdict for the Mayers for $484,825. The jury attributed 20 percent of the fault to the Mayers, 20 percent to Marvin Windows, and 5 percent to Pacific Alki. The net verdict after deducting these attributions was $266,653.75.
The Mayers again moved for a discovery sanction against Sto and for attorney fees and other litigation expenses. Sto then moved to dismiss the Mayers' CPA claim and request for stigma damages as a matter of law.
In addition to the verdict, the trial court awarded the Mayers a discovery sanction of nearly $780,000 ($468,147.29 for trial fees and expenses from the first trial and $276,732.75 for interest on the fees), $10,000 in CPA treble damages; and more than $400,000 in attorney fees and costs for the second trial. In making a total judgment against Sto of $1,456,634.34, the court applied a lodestar multiplier of 1.57 to account for the risk the Mayers' counsel incurred in the second trial when it calculated attorney fees for the CPA claim. The court specifically enumerated its reasons for the multiplier earlier in its findings. Some of those reasons included time and labor required, the novelty and difficulty of the questions involved, and the fee typically charged in the locality for similar legal services. The court further noted that it was not able to separate the attorney fees for the CPA claims from the attorney fees for the non-CPA claims. Sto now appeals to this court, arguing that the trial court abused its discretion in many ways including, by imposing a discovery sanction against it. The Mayers cross-appeal, arguing that the court erred by not imposing a larger discovery sanction against Sto and that they are entitled to all their litigation costs.

I. Discovery Sanction
Sto argues that the trial court abused its discretion by awarding a large discovery sanction to the Mayers. We agree.
Our supreme court has set out a test for the trial court to follow before awarding sanctions. In this case, the trial court neglected to follow appropriate procedure. Before a trial court chooses an allowable harsh remedy under CR 37(b), it must consider three elements: (1) Was there a willful violation of a discovery order? (2) Did the violation substantially prejudice the opponent's ability to prepare for trial? and (3) Did the court consider a lesser sanction. Burnet, 131 Wash.2d at 494, 933 P.2d 1036. The record contains no findings on these elements.
When we ordered a new trial, the Mayers' asserted a claim under CR 37(b) for discovery violations. The Mayers now claim that the discovery violation was under CR 26(g) and does not require the procedure outlined in Burnet. We disagree. We note that the procedure required in Burnet was for a CR 26(f) violation. The Burnet rationale applies equally and is required under either civil rule. Oddly, we granted a new trial for a claimed CR 37 violation, yet Judge McCarthy found that Sto did not violate CR 26(g). *121 Nonetheless, under either rule, the trial court must follow the Burnet procedures.
The trial court's findings are also silent with regard to substantial prejudice the Mayers experienced. It merely concluded without explanation that the Mayers suffered substantial prejudice. Also, the trial court did not articulate which rule it employed in order to impose sanctions; if there was a specific order that was violated under CR 37; or if the award was imposed under the inherent power of the court.[3]
Finally, the record does not reveal whether the trial court considered lesser sanctions. The trial court must indicate on the record that it considered less harsh sanctions under CR 37 before imposing a sanction. Rivers v. Wash. State Conference of Mason Contractors, 145 Wash.2d 674, 696, 41 P.3d 1175 (2002). The court's failure to do so is an abuse of discretion. Rivers, 145 Wash.2d at 696, 41 P.3d 1175. Here, the court abused its discretion. The record shows only that the court agreed with the Mayers that Sto should compensate the Mayers for Sto's discovery abuse. It does not show that it considered a lesser sanction. Because the trial court failed to apply the Burnet test, we remand for it to do so.

II. Interest on the Sanctions
The trial court also imposed prejudgment interest on the fees and costs the Mayers incurred in the first trial. Prejudgment interest is allowed on liquidated claims only. Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 32, 442 P.2d 621 (1968). Awards of reasonable attorney fees are classically unliquidated claims. Flint v. Hart, 82 Wash.App. 209, 226, 917 P.2d 590 (1996). When the trial court reconsiders sanctions on remand, it may not impose prejudgment interest.

III. CPA Claim
The Washington Consumer Protection Act (CPA) is found at chapter 19.86 RCW. In order to prevail in a private CPA action, a plaintiff must establish all five of the following elements: (1) an unfair or deceptive act; (2) that occurred in trade or commerce; (3) that affects the public interest; (4) an injury to the plaintiff's business or property; and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 784, 785, 719 P.2d 531 (1986). If the plaintiff does not establish all five elements, the CPA claim fails. Hangman Ridge, 105 Wash.2d at 784, 719 P.2d 531. Sto challenges three elements. The Mayers established all elements of their CPA claim.

A. Unfair or Deceptive Act or Practice
To satisfy this element, the Mayers had to show that the act in question "had the capacity to deceive a substantial portion of the public." Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531. Here, that act was marketing Sto's EIFS system. Sto argues that there was no capacity to deceive a substantial portion of the public because its marketing was aimed at design professionals and contractors.
Sto's argument would be correct if the communications to the Mayers were isolated events. Henery v. Robinson, 67 Wash.App. 277, 291, 834 P.2d 1091 (1992), review denied, 120 Wash.2d 1024, 844 P.2d 1018 (1993). But here, Sto provided the details about its product to professionals in the construction industry. These professionals then used this same information to market to the public at large. It is not important whether Sto intended to deceive; the Mayers need only show that Sto's acts had the capacity to deceive a substantial portion of the public. Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531. By providing false information to construction professionals about the Sto product, Sto took part in unfair or deceptive acts that had the capacity to deceive a large portion of the public.

B. Public Impact
If a transaction is essentially a private dispute, we apply five factors to assess an impact on the public interest. Those factors are: (1) Were the alleged acts committed in *122 the course of defendant's business? (2) Were the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed before the act involving plaintiff? (4) Was there a real and substantial potential for the defendant to repeat its conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it? Hangman Ridge, 105 Wash.2d at 790, 719 P.2d 531. Not all these factors need be present for the trier of fact to find a public interest impact. Hangman Ridge, 105 Wash.2d at 791, 719 P.2d 531.
The answer to the first factor is "yes." Sto's marketing occurred in the course of business. The answer to factor two is also "yes." Sto advertised to the public in general. The answer to factor three is "no," as Sto did not solicit the Mayers. The Mayers chose to use the Sto product after finding out about it from their architect. The answer to factor four is also "yes." Sto continued to claim its product was safe and effective as documented by corporate memorandums.
As to factor five, we examine the likelihood that other plaintiffs were injured or will be injured in exactly the same fashion. Hangman Ridge, 105 Wash.2d at 790, 719 P.2d 531. The Mayers presented no evidence that other plaintiffs in suits against Sto were deceived in the same fashion. But, considering Sto's staunch stance to blame others for the defective nature of the EIFS system, it is a reasonable assumption that other consumers were hurt by Sto in the same manner after they relied on Sto's literature or representations made to them by construction professionals. The Mayers adequately proved Sto's deceptive acts had an impact on the public interest.

C. Causation
The fifth element in a CPA claim is a causal link between the deceptive or unfair act and the plaintiff's injury. Hangman Ridge, 105 Wash.2d at 793, 719 P.2d 531. A plaintiff establishes causation if he shows the trier of fact that he relied on a misrepresentation of fact. Nuttall v. Dowell, 31 Wash.App. 98, 111, 639 P.2d 832, review denied, 97 Wash.2d 1015 (1982). Where a defendant induces a plaintiff to act or refrain from acting, the causation requirement is met. Anhold v. Daniels, 94 Wash.2d 40, 46, 614 P.2d 184 (1980); Hangman Ridge, 105 Wash.2d at 793, 719 P.2d 531. Sto contends that the Mayers chose to use its products based on recommendations and not from Sto's promotional materials.
Before picking the Sto product, the Mayers chose to use a competitor's EIFS system. That decision occurred before the Mayers met with Jim Parish, the Sto product distributor, and before receiving or reviewing any of the Sto materials Parish provided.
Kurtis Mayer testified at trial that he decided to use Sto's product instead of Dryvit because he could save more money and receive a longer warranty period using the Sto product. He further stated he chose to use a barrier system on his house before finding out about the Sto products. Kurtis's testimony shows that he considered other factors besides the marketing materials in choosing to use the Sto products. But it is equally clear that he relied on the written material Sto supplied. Thus, the Mayers proved that Sto's deceptive marketing techniques led to their injury. The trial court did not err when it found that the Mayers satisfied all elements of their CPA claim.

IV. CPA Attorney Fees and Costs Award
Sto asserts the trial court abused its discretion in setting the CPA attorney fees and costs award. Again, we agree.

A. CPA Attorney Fees

1. Segregation of Fees

Where a party violates RCW 19.86.020, the statute authorizes the recovery of actual damages and costs, which include a reasonable award of attorney fees. RCW 19.86.090.[4] The trial court has broad discretion *123 to award attorney fees. Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc., 64 Wash.App. 553, 566, 825 P.2d 714, review denied, 120 Wash.2d 1002, 838 P.2d 1143 (1992). The court calculates attorney fees in a CPA claim by establishing a "lodestar" fee (i.e., multiplying a reasonable hourly rate for the attorney by the number of hours reasonably spent on the theories necessary to establish the CPA claim). Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 334, 858 P.2d 1054 (1993). The court then adjusts that rate based on a contingent nature of success. Fisons, 122 Wash.2d at 334, 858 P.2d 1054. But, the time a party spends developing theories essential to a CPA claim must be segregated from time spent on other legal theories relating to other causes of action. Sign-O-Lite, 64 Wash.App. at 566, 825 P.2d 714.
In making the attorney fee award, the court must find that the time spent by the attorney was essential to the CPA claim. Travis v. Wash. Horse Breeders Ass'n, Inc., 111 Wash.2d 396, 411, 759 P.2d 418 (1988). The court must include in the record, a showing of the segregation of time spent on legal theories pertaining to the CPA claim and the other legal theories in the case. Travis, 111 Wash.2d at 411, 759 P.2d 418. Sto contends the trial court failed to segregate the CPA claims from the non-CPA claims when it awarded the attorney fees. We review a trial court's award of attorney fees for an abuse of discretion, Travis, 111 Wash.2d at 410, 759 P.2d 418, and find such error here.
In the court's finding, it makes a note that "[t]he requested CPA fees could not realistically be separated from time spent pursuing their Product Liability Act claims." 9 Clerk's Papers (CP) at 3489. This finding directly conflicts with this court's holding in Smith v. Behr Process Corp., 113 Wash.App. 306, 54 P.3d 665 (2002). In Smith, we remanded the entire CPA attorney fees award so that the trial court could appropriately segregate the claims or clarify whether it actually conducted the segregation. Smith, 113 Wash.App. at 344-45, 54 P.3d 665. Regardless of the difficulty in segregation, the trial court must perform the task. Smith, 113 Wash.App. at 344-45, 54 P.3d 665. Here, the court failed to segregate the CPA claims from the non-CPA claims. Thus, we remand the entire CPA attorney fees award for the trial court to recalculate the award segregating the non-CPA claims on the record.

2. Multiplier

A trial court has the discretion to apply a multiplier to a lodestar attorney fee. Boeing Co. v. Heidy, 147 Wash.2d 78, 90-91, 51 P.3d 793 (2002). "The appellate courts exercise a supervisory role to ensure that discretion is exercised on articulable grounds." Eagle Point Condo. Owners Ass'n v. Coy, 102 Wash.App. 697, 715, 9 P.3d 898 (2000) (citing Mahler v. Szucs, 135 Wash.2d 398, 434-35, 957 P.2d 632 (1998)). The trial court must make findings of fact and conclusions of law on the record for its award to stand on appeal. Coy, 102 Wash.App. at 715, 9 P.3d 898 (citing Mahler, 135 Wash.2d at 433-35, 957 P.2d 632). This court remands the trial court's fee award when the findings and conclusions are entirely conclusory and without explanation for the basis of the award. Coy, 102 Wash.App. at 715-16, 9 P.3d 898.
Once a court calculates a lodestar figure, the court may consider adjusting the figure to consider factors not considered up to that point. Bowers, 100 Wash.2d at 598, 675 P.2d 193. The court can adjust the lodestar on two bases: to account for the risk factor in the case or to reflect the attorney's quality of work. Bowers, 100 Wash.2d at 598-99, 675 P.2d 193. Sto argues that the court incorrectly applied a multiplier to the present case.
The court applied a multiplier of 1.57 to account for the risk the Mayers' counsel incurred in the second trial. The court specifically enumerated its reasons for the multiplier earlier in its findings but it did not state on the record how it determined that 1.57 *124 was appropriate for the multiplier. In order to apply a multiplier based on the contingent nature of success, the court must consider the "likelihood of success at the outset of the litigation." Bowers, 100 Wash.2d at 598, 675 P.2d 193. The multiplier used was reasonable, even though the trial court did not set its basis.

B. Award of Costs
Sto contends the trial court awarded costs to the Mayers not covered by RCW 4.84.010. Sto is correct.
RCW 4.84.010 allows for recovery of the following costs:
(1) Filing fees;
(2) Fees for the service of process by a public officer, registered process server, or other means;
....
(3) Fees for service by publication;
(4) Notary fees, but only to the extent the fees are for services that are expressly required by law and only to the extent they represent actual costs incurred by the prevailing party;
(5) Reasonable expenses, exclusive of attorneys' fees, incurred in obtaining reports and records, which are admitted into evidence at trial or in mandatory arbitration in superior or district court ...;
(6) Statutory attorney and witness fees; and
(7) To the extent that the court or arbitrator finds that it was necessary to achieve the successful result, the reasonable expense of the transcription of depositions used at trial or at the mandatory arbitration hearing.
RCW 4.84.010. Initially, the Mayers requested $169,822 in litigation costs under the CPA. The court then subtracted court reporters and transcript fees, professional fees, and expert fees. The amount awarded to the Mayers, less the above expenses, was $48,691.05. Sto asserts that this figure still contains expenses RCW 4.84.010 does not cover.
Nordstrom, 107 Wash.2d 735, 733 P.2d 208, controls. There, the supreme court held that a plaintiff in a CPA action could only recover those costs defined in RCW 4.84.010. Nordstrom, 107 Wash.2d at 743, 733 P.2d 208. It is not clear from the record whether the trial court followed the Nordstrom ruling. Although the court subtracted inappropriate fees from the costs award, the court did not list what it awarded fees for, nor does the record contain such a list. Thus, this court cannot review the trial court's finding. Thus, we also remand this issue for the trial court to clarify what costs it awarded. And, if any of these costs are not covered by RCW 4.84.010, the court should subtract those fees from the cost award.

V. Statute of Limitations Issue
Sto asserts that the Mayers' WPLA claim and their CPA claim were time barred. We disagree.
The statute of limitations for WPLA is codified in RCW 7.72.060(3). RCW 7.72.060(3) provides: "no claim under this chapter may be brought more than three years from the time the claimant discovered or in the exercise of due diligence should have discovered the harm and its cause." Our supreme court has held that a claimant in a product liability case must have discovered, or in the exercise of due diligence should have discovered, a factual causal relationship of the product to the harm. North Coast Air Servs., Ltd. v. Grumman Corp., 111 Wash.2d 315, 319, 759 P.2d 405 (1988). This action was commenced in April 1995; thus, the WPLA action must have been discovered before April 1992.
Sto relies on a letter that Kurtis Mayer wrote to a Marvin Windows representative in 1995 as showing that Mayer knew about the damage in 1990. In North Coast Air, the court further stated that an action does not accrue at the time a claimant knew of the harm but "that the claimant must know or should with due diligence know that the cause in fact was an alleged defect." North Coast Air, 111 Wash.2d at 319, 759 P.2d 405. The Mayers noticed the rust stains in 1990 but it was not until they discovered the dry rot in 1994 that they began to think the combination of Marvin Windows and the Sto EIFS system were the cause of their problem. *125 The Mayers sued Marvin Windows and Sto in 1995. Further, the jury answered by interrogatory in both trials that the Mayers did not know and should not have discovered a factual causal relationship between the Sto products and harm to their residence before April 19, 1992. This was within the three-year statute of limitation proscribed in RCW 7.72.060(3). Clearly, the Mayers' claim is not time barred because they had no reason to believe that Sto's product was the reason for their damage until 1994.
A Washington CPA action carries a four-year statute of limitations. RCW 19.86.120. For the reasons stated above, Sto's CPA argument also fails as the Mayers brought their claim in sufficient time.

VI. Property Damages
Sto argues that the trial court erred in instructing the jury on damages. Sto contends that the Mayers are not entitled to recover both the costs of repairing their vacation home and its alleged diminution in value. The Mayers respond that the law allows full recovery of their property damages. The Mayers rely on Pugel v. Monheimer, 83 Wash.App. 688, 693, 922 P.2d 1377 (1996), review denied, 131 Wash.2d 1024, 937 P.2d 1101 (1997), as supporting the trial court's award of both types of damages. In the circumstances of this case, the law supports the awarding of both restoration costs and diminution in value.
In Burr v. Clark, 30 Wash.2d 149, 190 P.2d 769 (1948), the supreme court set out how to award property damages where damage had occurred to real property. The court stated that where an injury to real property is only temporary and "the property can be restored to its original condition at a reasonable expense and at a cost less than the diminution in the value of the property," the damages award is just the costs of restoration. Burr, 30 Wash.2d at 158, 190 P.2d 769.
In Pugel, the court found that withdrawing a lateral support that damaged Pugel's property was permanent and not temporary. Pugel, 83 Wash.App. at 693, 922 P.2d 1377. Pugel did not attempt at trial to establish the difference in the market value of his property before the damage with the market value after the injury. Pugel, 83 Wash.App. at 692, 922 P.2d 1377. He only established his loss market value after he repaired his property. Pugel, 83 Wash.App. at 692-93, 922 P.2d 1377. The court awarded both restoration costs and loss of value to the property because the trial court incorrectly limited Pugel to only his loss of value without considering repair expenses. Pugel, 83 Wash.App. at 693, 922 P.2d 1377.
The Mayers presented unrebutted expert testimony that in addition to the repairs, they had suffered a permanent loss because they will have to disclose that the home is sided with EIFS, a known defective product, and their repair costs of almost $400,000 to stop the damage. The Mayers' expert opined that even after repair, prospective buyers will pay less than the value because of the required disclosures. Thus, this was an appropriate occasion to instruct on both types of damages. The jury found the loss to be $130,900. The court properly instructed on stigma damages; substantial evidence supports both cost of repair and permanent loss.

VII. Appellate Attorney Fees
The Mayers request attorney fees under RAP 18.1 and RCW 19.86.090 of the CPA for defending this appeal. Under RCW 4.84.010, this court can award statutory attorney fees but only to the prevailing party. Generally, a prevailing party is one who receives an affirmative judgment in his favor. Riss v. Angel, 131 Wash.2d 612, 633, 934 P.2d 669 (1997). Here, the Mayers are not the prevailing party. Thus, we award no attorney fees.

VIII. Cross-Appeal Issues

A. Sanctioning of Discovery Abuses
The Mayers contend the trial court erred by not further sanctioning Sto for its discovery abuse. Relying on Fisons and Burnet, Sto responds that the court appropriately sanctioned it and further sanctions would be a violation of Burnet. We agree.
The purpose of discovery sanctions is "to deter, to punish, to compensate, and to educate." *126 Fisons, 122 Wash.2d at 356, 858 P.2d 1054. Further, a discovery sanction should "insure the wrongdoer does not profit from the wrong." Fisons, 122 Wash.2d at 356, 858 P.2d 1054. The Mayers argue that Sto is profiting from its discovery abuse. But, there is no showing of how Sto is benefiting, and the court plainly imposed a large sanction on Sto, i.e., $468,147.29. Thus, we decline the Mayers' suggestion to impose greater sanctions to be paid to the Law Fund because we find no reason to do so. The trial court did not err by not imposing further sanctions.

B. Litigation Costs
The Mayers assert that they are entitled to all of their litigation costs in light of Sto's litigation strategy. The Mayers cite to several cases they claim support their assertion. The cases the Mayers cite do not overrule the law stated in Nordstrom, thus, the Mayers are not entitled to any costs except for those stated in RCW 4.84.010.

CONCLUSIONS
We remand to the trial court to apply the Burnet test on the record for awarding sanctions. The court should also not impose interest on the sanctions.
We also remand the attorney fees award under the CPA for segregation of time spent on CPA claims from time spent on non-CPA claims.
We remand the award of costs to the trial court for clarification of the awarded costs, i.e., the court may only award those costs covered under RCW 4.84.010.
The Mayers' attorney fees request is denied as they did not substantially prevail on appeal.

Cross-Appeal Issues
We affirm the trial court's decision not to impose further sanctions on Sto.
We deny the Mayers request to recover all costs spent on litigation. The Mayers cannot recover any other costs except those listed in RCW 4.84.010.
We concur: HOUGHTON, P.J., and ARMSTRONG, J.
NOTES
[1] It is important to note that Sto also withheld other documents that were introduced at the second trial showing that Sto knew its product was faulty and yet continued to lie about the quality of the product.
[2] The first case is Mayer v. Sto Indus., Inc., No. 22494-1-II, 97 Wash.App. 1029, 1999 WL 704714 (Wash.Ct.App. Sept.10, 1999) (unpublished).
[3] We do not hold the sanction amount was improper, but rather the procedure was improper. On remand, the trial court could impose the same or a different sanction as long as it sets forth its reasons under Burnet, 131 Wash.2d at 494, 933 P.2d 1036.
[4] RCW 19.86.090 states in part:

Any person who is injured in his or her business or property by a violation of RCW 19.86.020,... may bring a civil action in the superior court to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee, and the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained: PROVIDED, That such increased damage award for violation of RCW 19.86.020 may not exceed ten thousand dollars.