[No. 27926-2-I.    Division One.    January 21, 1992.]

SIGN-O-LITE SIGNS, INC., *Appellant*, v. DELAURENTI FLORISTS, INC., ET AL, *Respondents*.

554

*Jeffrey A. Smyth, Keith D. Petrak, Randall H. Moeller,* and *Adolph & Smyth, P.S.,* for appellant.

*Edward R. Coulson, Douglas H. Ogden,* and *Foster Pepper & Shefelman,* for respondents.

COLEMAN, J. — Sign-O-Lite (Sign)[1] appeals the trial court's judgment on the verdict that Sign violated the Consumer Protection Act (CPA) and the court's award of treble damages, attorney fees, and costs under the CPA to DeLaurenti and DeLaurenti Florists, Inc. (collectively DeLaurenti). Sign also appeals the court's refusal to give a proposed jury instruction regarding unjust enrichment. DeLaurenti cross-appeals the trial court's refusal to submit to the jury the issue of DeLaurenti's actual damages. We affirm in part and reverse in part.

Ann DeLaurenti owns and operates DeLaurenti Florists, Inc., a floral shop located in the Eastgate Shopping Plaza. In April 1986, DeLaurenti learned that the Plaza would be requiring the tenants to display "Channelume" signs to advertise their respective stores. Realizing that she would have to replace her nonconforming wooden sign, DeLaurenti sought bids from manufacturers for the construction of a Channelume sign. One manufacturer estimated the cost to be $4,100.

In addition, Chuck Kelly, a representative of Sign, solicited DeLaurenti at her store and offered to provide her with a bid for a Channelume sign to meet the Plaza's new criteria. DeLaurenti indicated she was interested in a bid, and Kelly later contacted her by phone. According to DeLaurenti, Kelly told her that she could lease a sign for $91.04 per month for 6 years plus tax and optional maintenance costs, or she could purchase the sign for $2,901.60. Because Sign's bid was lower than the other companies', DeLaurenti gave the job to Sign.

---

[1]Sign is now known as "342 Inc.".

On September 10, 1986, Kelly arrived at DeLaurenti's shop and presented her with a document to sign. DeLaurenti told Kelly that she did not have her reading glasses with her that day, but Kelly explained that her signature would merely authorize Sign to begin work on her order. In her capacity as president of the corporation and in her personal capacity, DeLaurenti signed what she remembered as being a 2-page document. She also initialed a space on the document which, according to Kelly, indicated that she did not want extraordinary maintenance for the sign.[2] DeLaurenti did not see Kelly fill in any blanks on the document except to sign his name.

On the same day that she signed the document, DeLaurenti gave Kelly a check made payable to Sign in the amount of $497.42. The Plaza also contributed $1,000 toward the cost of the Channelume sign. DeLaurenti believed that those two checks amounted to half the total purchase price of the sign and that she could either pay the balance when the sign was installed or she could make monthly installment payments of $91.04 under the arrangement Kelly had described in their earlier phone conversation. DeLaurenti did not recall any discussion about how the $1,497.42 had been calculated. She did not receive a copy of the document she signed or any other written indication from Sign about the terms of the lease or the purchase price. DeLaurenti testified that when she signed the form Kelly gave her, she had been relying upon the representations Kelly had made to her over the phone.

In mid-December 1986 Sign installed the completed Channelume sign above DeLaurenti's storefront. Shortly thereafter, Sign sent DeLaurenti an invoice for $445.97 for the rental cost of the sign for the latter half of December and all of the following January. However, because the sign was not properly lit, DeLaurenti did not pay Sign.

---

[2]In actuality, by indicating that she did not want to pay for extraordinary maintenance, DeLaurenti was agreeing to comply with paragraph 13(1) of the document which obligated her to buy insurance for the value of the sign at a monthly rate of $4 plus 4 percent of the monthly payment.

Once the sign was working properly, DeLaurenti called Sign's main office and requested her balance due so she could pay it in full. She received a computer printout from Sign indicating that she would owe $21,958.56 which was the total cost of leasing the sign at $305 per month for 6 years.[3] DeLaurenti informed Sign that she had not agreed to those terms and would not abide by them but, instead, would pay them the difference between the purchase price as Kelly had represented it (approximately $2,900) and what Sign had already received for the sign ($1,497.42). DeLaurenti also requested a copy of the documents that she had signed.

When she received a copy of the display rental agreement, DeLaurenti saw that she had signed a four-page document whose terms indicated that she agreed to pay Sign $297.42 plus tax for monthly rental of the sign "for the Term of the number of days the Display operates during the month of installation, plus 72 months thereafter . . . plus 5 months[.]" The monthly rental amount had been written in a blank spot by Kelly. Sign continued to send monthly invoices which DeLaurenti did not pay.

In July 1988 Sign filed a collection action against De-Laurenti, alleging breach of contract and unjust enrichment and seeking damages exceeding $22,000 plus attorney fees and costs pursuant to the terms of the rental agreement. DeLaurenti's answer presented several affirmative defenses as well as two counterclaims alleging fraud and violation of the CPA (RCW 19.86.090).[4] DeLaurenti sought dismissal of

---

[3]DeLaurenti asked a competing sign manufacturer to estimate the value of the installed sign, and the estimate given was $3,950.

[4]RCW 19.86.090 reads in pertinent part:
"Any person who is injured in his or her business or property by a violation of RCW [19.86.020 through 19.86.060] . . . may bring a civil action in the superior court to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee, and the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained: *Provided,* That such increased damage award for violation of RCW 19.86.020 may not exceed ten thousand dollars[.]"

the complaint, exemplary damages pursuant to the CPA, and attorney fees and costs.

At trial, Sign presented the court with a supplemental jury instruction regarding unjust enrichment. Although the trial court refused to give the instruction, it later concluded that Sign was in fact entitled to damages for unjust enrichment. The court determined that the only evidence in the record of the fair market value of the sign was $160 per month and that DeLaurenti had use of the sign for 48 months.

In addition, the court refused to send the issue of DeLaurenti's actual damages to the jury because the evidence of such damages was insufficient. DeLaurenti had proposed a damage instruction for the jury to use if it found Sign liable for fraud, but the court did not read it to the jury. Instead, the trial court gave a modified instruction that explained the elements of a CPA violation.[5]

The jury completed the following questions on the verdict form:

A. Is the written contract for the lease of a sign unenforceable because of lack of opportunity to review, ambiguity, or understandability?

<u>YES</u>

B. Did plaintiff commit fraud to induce defendants to sign the written contract for the lease of a sign?

<u>NO</u>

C. Did plaintiff violate the Consumer Protection Act to induce the defendants to sign the written contract for the lease of a sign?

<u>YES</u>

D. Did plaintiff enter into an oral agreement for defendants to purchase a sign?

<u>NO</u>

E. Did plaintiff enter into an oral agreement for defendants to lease the sign?

<u>NO</u>

---

[5] During oral argument, counsel for DeLaurenti stated that another instruction regarding actual damages not resulting from fraud had been rejected by the trial court, but that proposed instruction does not appear in the appellate record.

The trial court subsequently denied Sign's motion for a new trial and concluded in part as follows:

2. Plaintiff 342 Inc. is awarded $7,680.00 against defendants for its claim of unjust enrichment for the reasonable rental value of the sign, less the amount of $1,497.42 previously paid to plaintiff by defendants, for a judgment of $6,182.58;

3. Defendants and counterclaimants DeLaurenti [Floral] Company, Inc. and Ann E. DeLaurenti are awarded judgment for treble damages against plaintiff 342 Inc. in the amount of $10,000, based upon the fact of damage that inheres in the attorneys' fees incurred in defense against a contract found by the jury to violate RCW 19.86;

4. Defendants and counterclaimants . . . are awarded judgment for reasonable attorneys' fees in the amount of $24,291.00;

5. Defendants and counterclaimants . . . are awarded judgment for costs incurred in the amount of $1,119.15;

6. The net amount of judgment in favor of plaintiff and judgment in favor of defendants is a net judgment in favor of defendants in the amount of $3,817.42. This amount, plus attorneys' fees and costs awarded to defendants, in the total amount of $29,227.57, shall bear interest at the rate of 12% per annum from the date of this judgment until satisfied.

On appeal, Sign challenges the trial court's judgment on the verdict that Sign violated the CPA, the court's award of treble damages, attorney fees, and costs, and the court's refusal to instruct the jury according to the proposed unjust enrichment instruction. DeLaurenti appeals the court's refusal to instruct the jury as to DeLaurenti's actual damages.

## THE CPA VIOLATION

At the outset, we must determine whether the trial court erred by submitting the CPA claim to the jury. Sign contends that it was error to do so because the evidence was insufficient to prove four of the five elements of a CPA violation and because the trial court improperly delegated a question of law to the trier of fact.

■■ Whether a particular action gives rise to a violation of the CPA is reviewable as a question of law. *Keyes v. Bollinger*, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982). In

contrast, whether a party committed a particular act is reviewable under the substantial evidence test. *Keyes,* at 289. Substantial evidence exists if the evidence is sufficient "to persuade a fair-minded, rational person of the truth of the declared premise." *Beeson v. ARCO,* 88 Wn.2d 499, 503, 563 P.2d 822 (1977). Further, an issue is properly kept from the jury if "there is no evidence or reasonable inferences therefrom which would sustain a jury verdict in favor of the nonmoving party." *Schmidt v. Cornerstone Invs., Inc.,* 115 Wn.2d 148, 165, 795 P.2d 1143 (1990).

■ The five criteria for determining whether a party has violated the CPA are:

> (1) Is the action complained of an unfair or deceptive act or practice? (2) Did the action occur in the conduct of trade or commerce? (3) Is there a sufficient showing of public interest? (4) Was there injury in the plaintiff's business or property? and (5) Was there a causal link between the unfair acts and injury suffered?

*Nordstrom, Inc. v. Tampourlos,* 107 Wn.2d 735, 739, 733 P.2d 208 (1987); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 785-93, 719 P.2d 531 (1986). Sign asserts that the evidence failed to show that it committed an unfair or deceptive act or practice, that any of its actions had an impact on public interest, that DeLaurenti was injured in her business or property, or that a causal link existed between any action by Sign and any injury to DeLaurenti. Sign concedes that its agent had been acting within the context of trade or commerce.

■ 1. Unfair or Deceptive Act or Practice. To prove that an unfair or deceptive act has been committed, a claimant "need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public." *Hangman Ridge,* at 785. At trial, DeLaurenti testified that when Kelly appeared at her store with a document to sign, she expressly told him that she needed her glasses to read the document. She signed the document because Kelly assured her that she

would only be signing a work authorization form, when in fact her signature obligated her to pay Sign more than $22,000 over the course of 6 years for a sign worth approximately $4,000. Kelly also told DeLaurenti that if she initialed a certain blank on the document, she would be declining a provision for maintenance. In actuality, DeLaurenti's initials obligated her to pay Sign a significant monthly amount toward insurance for the sign. That evidence alone indicates that Sign's representative engaged in a deceptive act.

■ In addition, Kelly testified that Sign representatives routinely solicit businesses by making "cold calls", in which the representatives are "actually dropping in on people and saying we are in the sign business, and if they have a need for a sign we would like to have the opportunity to provide some art work for them and see if we can build them a sign." Sign's style of soliciting business is evidence that the potential exists for a substantial portion of the public to be deceived like DeLaurenti was. Thus, the evidence supported the implicit finding by the jury that Sign engaged in an unfair or deceptive act or practice.

■ 2. Public Interest. Whether the public interest element has been demonstrated is an issue for the trier of fact. *Hangman Ridge*, at 789. In the context of a private transaction,[6] four factors are relevant to establish public interest:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

*Hangman Ridge*, at 790-91. Not all of these factors must be present in order to find public interest impact. *Hangman Ridge*, at 791.

Sign acknowledges that its agent was acting in the course of Sign's business and actively solicited DeLaurenti (criteria

---

[6]Both parties characterize the transaction at issue as a private transaction rather than a consumer transaction, which would have different criteria for establishing a public interest.

1 and 3). Under the circumstances of this case and Sign's own acknowledgment that it routinely solicits other businesses, the evidence here was sufficient to show that Sign's acts or practices impact the public interest.

3. Injury to Claimant's Business or Property. Sign argues that DeLaurenti failed to prove any injury to her business or property. In addition, Sign contends that the trial court erroneously concluded that DeLaurenti's involvement in this litigation caused her injury as contemplated by the CPA.

■■ Before a CPA violation may be found, an injury to the claimant's business or property must be established. *Hangman Ridge*, at 792. However, the injury "need not be great". *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990). In *Nordstrom*, the court distinguished between "injury" and "damages", holding that with regard to injury,

> [t]his distinction makes it clear that no monetary damages need be proven, and that nonquantifiable injuries, such as loss of goodwill would suffice for this element of the *Hangman Ridge* test. This is bolstered by the fact that the act allows for injunctive relief, clearly implying that injury without monetary damages will suffice.

*Nordstrom*, at 740. As *Mason* elaborates,

> [t]he injury element will be met if the consumer's property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.

(Footnote omitted.) *Mason*, at 854.

In *St. Paul Fire & Marine Ins. Co. v. Updegrave*, 33 Wn. App. 653, 656 P.2d 1130, 35 A.L.R.4th 1 (1983) the court concluded that having to defend against a collection action and prosecute a counterclaim asserting a CPA violation was sufficient proof of injury under the CPA, though no injury to the claimants' business or property was ever alleged. *St. Paul*, at 659. Given the *Hangman Ridge* injury requirement, that portion of *St. Paul*'s holding is too broad. There must be some evidence, however slight, to show injury to the claimants' business or property. *See Hangman Ridge*, at

792; *Demopolis v. Galvin*, 57 Wn. App. 47, 55, 786 P.2d 804 (injury under the CPA must be injury to the claimant's business or property), *review denied*, 115 Wn.2d 1006 (1990); *Mason*, at 854 (amount of injury may be minimal).

Here, DeLaurenti's mere involvement in having to defend against Sign's collection action and having to prosecute a CPA counterclaim is insufficient to show injury to her business or property, contrary to the trial court's conclusion. To hold otherwise would be to invite defendants in most, if not all, routine collection actions to allege CPA violations as counterclaims.

Nevertheless, the present record reveals that DeLaurenti did indeed suffer injury to her business from Sign's unfair or deceptive acts. DeLaurenti specifically testified that because of her involvement with Sign, she was unable to tend to her store the way she normally would have. Moreover, for at least 3 hours each month for 4 years DeLaurenti was drawn away from her business and from her consulting work (for which she typically charged $35 per hour) in order to address matters regarding her contract with Sign. Given that the clear purpose of the CPA is to deter and protect against unfair or deceptive acts or practices, the evidence in this case — including the fact that DeLaurenti is self-employed and the sole owner of her business — is sufficient to support an inference that there was some injury to DeLaurenti's business, even though as discussed *infra* that injury was not quantifiable.

■ 4. Causal Link Between Unfair Acts and Injury Suffered. The final element of a CPA violation that Sign disputes is the existence of a causal link between the deceptive act and the injury suffered. *See Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 167, 795 P.2d 1143 (1990). The link between Sign's actions (through Kelly, its representative) and DeLaurenti's injury is clear from the record. Sign's deceptive acts significantly interfered with DeLaurenti's ability to tend to her store and to perform a portion of her consulting work.

In sum, we conclude that the evidence was sufficient to send the CPA issue to the jury and it amply supported the jury's conclusion that Sign violated the CPA.

## TREBLE DAMAGES

We next decide whether the trial court erred by assessing a $10,000 penalty as "treble damages" under the CPA. In its order and judgment, the trial court found that DeLaurenti was damaged because of "the damage that inheres in the attorneys' fees incurred in defense against a contract found by the jury to violate [the CPA]." Sign asserts, first, that treble damages were improper because incurring attorney fees is not "actual damages" as contemplated by the CPA and, second, that DeLaurenti failed to prove that she sustained any actual damages. We agree with both assertions.

■ RCW 19.86.090 states that "the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained", so long as the increased damage award does not exceed $10,000. Further, in *Mason*, the court stated:

> [w]hether an "injury" has been sustained so as to support an award of attorneys' fees and costs under the Consumer Protection Act is a different inquiry than whether treble damages are appropriately awarded. An injury cognizable under the Act will sustain an award of attorneys' fees, while treble damages are based upon "actual" damages awarded.

(Footnotes omitted.) *Mason*, at 855. Hence, the failure to show actual monetary damages precludes the recovery of treble damages under the CPA. *St. Paul*, at 660.

In this case, the trial court found no compensable damages but believed that the "unique circumstances" of the case justified a conclusion that DeLaurenti's attorney fees were "actual damages". Consequently, the court based the $10,000 treble damages upon the attorney fees DeLaurenti generated by defending against Sign's action and prosecuting her CPA claim.

The court erred in its analysis. The case law is clear that treble damages may only be based upon actual damages.

*See St. Paul*, at 660. Attorney fees as awarded in the present context do not qualify as actual damages. Though DeLaurenti gave sufficient testimony to permit a finding that some amount of injury occurred to her business, she presented insufficient evidence to prove any actual damages other than a general, uncorroborated estimate of lost potential earnings. Such an estimate is too speculative a basis upon which to predicate a specific damage award. Consequently, treble damages were not warranted, and that portion of the trial court's judgment is reversed.

### Attorney Fees and Costs

Sign also appeals the trial court's decision to assess Sign $24,291 in attorney fees and $1,119 in costs. Sign does not dispute that upon proving a CPA violation, a CPA claimant may receive an award of attorney fees and costs pursuant to the act (RCW 19.86.090) and the court's discretion. Instead, Sign argues that the court's fee award was improperly calculated.

Time spent developing theories essential to the CPA claim must be segregated from time spent on legal theories relating to other causes of action. *Travis v. Washington Horse Breeders Ass'n, Inc.*, 111 Wn.2d 396, 411, 759 P.2d 418 (1988). Further, the amount of attorney fees awarded under the CPA in relation to the amount of damages awarded "is not in itself decisive." *Travis*, at 410. The reasonableness of attorney fees is a factual issue depending upon the circumstances of a given case, and the trial court has broad discretion in fixing attorney fees. *Schmidt*, at 169.

We find that the award of attorney fees and costs under the CPA was appropriate in this case. As the trial court explained during the posttrial hearing, it segregated the fees to the extent possible, taking into account the overlapping nature of the successful counterclaim of deceptive conduct and the unsuccessful counterclaim of fraud. Any further segregation would be extremely difficult to do. Thus, we cannot conclude that the trial court abused its discretion in granting the award of attorney fees to DeLaurenti.

## Unjust Enrichment

We next address whether the trial court erred by refusing to instruct the jury about unjust enrichment and the fair rental value of the sign. Sign contends that the trial court erred in this regard because the record contained substantial evidence to support such an instruction. Sign also argues that the trial court erred by concluding that $160 per month was the only evidence in the record representing the fair rental value of the sign.

█ Jury instructions should be given "that conform to pleadings, permit each party to argue his or her theory of the case to the jury and find sufficient evidentiary support in the record." *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wn. App. 561, 569, 794 P.2d 66 (1990). Here, the evidence was sufficient to support Sign's theory of unjust enrichment, and the trial court erred by excluding that instruction. However, that error was harmless. *See Sturgeon v. Celotex Corp.*, 52 Wn. App. 609, 625, 762 P.2d 1156 (1988) (error is not prejudicial unless it affects or presumptively affects the outcome of the trial). The only testimony that specifically estimated the fair market value of DeLaurenti's Channelume sign was that offered by Arthur Schilling, a Washington sign manufacturer and DeLaurenti's expert witness. Schilling estimated the monthly rental value of the sign to be $160.

Sign, however, suggests that the rental value listed in the parties' agreement ($297 plus tax) was another indicator of fair rental value. Given that the jury specifically found that agreement to be unenforceable, that figure is not necessarily a reliable indicator of the fair rental value of the sign. Likewise, the record indicates that the $91 figure that Kelly gave DeLaurenti was for a single-faced (non-Channelume) type sign.

Because the only actual estimate of the monthly rental value was $160, the trial court did not err in basing Sign's unjust enrichment award upon that figure and the resolution of that issue would not have differed had it been given

to the jury. For the same reason, the trial court did not err by refusing to grant Sign's motion for a new trial, which was based on the claimed error regarding unjust enrichment.

## MEASURE OF ACTUAL DAMAGES

▮ DeLaurenti contends that the trial court erred by not submitting the issue of actual damages to the jury. As discussed above, DeLaurenti failed to present specific evidence of actual damages to her business or property as a result of some deceptive act by Sign. Without "evidence or reasonable inferences therefrom which would sustain a jury verdict in favor of the nonmoving party", an issue should be kept from the jury. *Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 165, 795 P.2d 1143 (1990).[7] Consequently, it was not error for the trial court to refuse to instruct the jury to determine DeLaurenti's actual damages.

## ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal. The policy behind the statutory award of fees is aimed at helping the victim file the suit and ultimately serves to protect the public from further violations. In keeping with that policy, we award DeLaurenti her fees on appeal. However, given that Sign's appeal with regard to treble damages was successful, some adjustment in the fee is warranted. Pursuant to RAP 18.1(f), the precise amount of the fee award will be determined by a Commissioner.

In sum, we reverse the Superior Court's award of treble damages but affirm the remainder of the judgment.

AGID, J., concurs.

---

[7] We also note that the damage instruction which DeLaurenti argues should have been given to the jury is not included in the appellate record. Pursuant to RAP 10.4(c), a party must include the text of the proposed jury instruction before a reviewing court will consider any alleged error relating to that instruction. *Thomas v. French*, 99 Wn.2d 95, 99, 659 P.2d 1097 (1983).

SCHOLFIELD, J. (dissenting) — I concur in all portions of the majority opinion, except for the holding that DeLaurenti suffered injury to her business or property sufficient to support an award of attorney's fees under the CPA.

The majority opinion is correct in holding that incurring attorney's fees in defending a collection action and prosecuting a counterclaim asserting a CPA violation is not sufficient proof of injury to the claimant's business or property.

The majority opinion is in error, however, in holding that DeLaurenti's time devoted to the litigation and problems with the Sign-O-Lite contract were sufficient proof of an injury to her business or property.

In my view, both the attorney's fees incurred and the personal time devoted to the litigation cannot be distinguished. They are both incurred for the same reason — the disagreement over the contract with Sign-O-Lite and the resulting litigation. If the incurring of attorney's fees is not an injury, then neither is the personal time devoted to the same litigation.

The majority opinion states at page 564, "To hold otherwise would be to invite defendants in most, if not all, routine collection actions to allege CPA violations as counterclaims." The same objection applies to treating personal time devoted to the litigation as an injury under the CPA. Once a court holds that an injury is shown when a party devotes personal time to the litigation, the effect will be to allege CPA violations as counterclaims, even when no actual damage is sustained.

In *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990), the court stated that a loss of use of property which is causally related to an unfair or deceptive act or practice is sufficient injury to constitute the fourth element of a CPA violation.

In *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 733 P.2d 208 (1987), the court found that an injury based upon loss of business reputation and loss of goodwill caused by

the trade name infringement of the defendant constituted an injury to business or property for purposes of the CPA.

Both loss of use of property and damage to business reputation and loss of goodwill are compensable in actual damages where sufficient proof is presented.

The loss of time and inconvenience of being involved in litigation is not caused directly by the deceptive practice of the defendant. Like attorney's fees, the loss of time and inconvenience arises out of the litigation itself. In the absence of litigation, the incurring of attorney's fees and loss of time do not occur.

I dissent from that portion of the majority opinion holding that DeLaurenti's devotion of time to the litigation was sufficient proof of an injury to her business or property to support an award of attorney's fees under the CPA.

I note that paragraph 32 of the agreement involved in this case provides for attorney's fees to be paid by the advertiser (DeLaurenti) in respect to "any action brought with respect to this Agreement or in any way connected herewith". Exhibit 1.

The record indicates that the award of attorney's fees pursuant to this provision was the subject of discussion with the trial judge.

RCW 4.84.330 provides for attorney's fees to the prevailing party where fees are provided for in a contract or lease. Should the award of attorney's fees to DeLaurenti pursuant to the CPA be reversed, as I think it should be, DeLaurenti would be entitled to have the trial court pass on her claim for attorney's fees pursuant to the contract provision and RCW 4.84.330.

I would reverse the award of attorney's fees under the CPA and remand to the trial court for the purpose of permitting DeLaurenti to pursue her claim for attorney's fees based upon the contract provision.

Reconsideration denied March 4, 1992.

Review denied at 120 Wn.2d 1002 (1992).